IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DEFENDERS OF WILDLIFE
and FOREST GUARDIANS,

       Plaintiffs,

vs.                                          No. CIV 02-150   JB/LAM

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Plaintiffs' Opening Case Brief, filed April 14, 2003 (Doc. 28).  The primary issue is whether the Defendant United States Environmental Protection Agency's ("EPA") approval of the revised "flood control and irrigation facility" exemption contained in New Mexico's proposed standards was arbitrary and capricious.  Because the Court finds that the EPA's approval was reasonable, the Court will affirm the administrative decision.

**STATUTORY AND REGULATORY  BACKGROUND**

**I.     CLEAN WATER ACT REQUIREMENTS**

Congress enacted the Clean Water Act ("CWA"), 33 U.S.C. § § 1251-1387, in 1972.  The CWA establishes a comprehensive program "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by reducing and eventually eliminating the discharge of pollutants into those waters.  Id. § 1251(a).  "The Act also seeks to attain 'water quality which provides for the protection and propagation of fish, shellfish and wildlife.'" P.U.D. No. 1 of Jefferson County v. Washington Dep't of Ecology, 511 U.S. 700, 704 (1994)(quoting 33 U.S.C. § 1251(a)(2)).

The CWA creates a framework to reduce pollution in the nation's waterways by allocating specific regulatory responsibilities for pollution control both to the state and to the federal governments.

## II.   WATER QUALITY STANDARDS

A basic element of CWA's framework is water quality standards, which identify desired beneficial uses and ambient water quality necessary to support those uses for various waters.  Under the CWA, Congress required states, and gave states the primary responsibility, to adopt water quality standards for their surface waters.  See 33 U.S.C. § 1313(a)(1).  Congress also requires the states to review those standards at least once every three years in a process known as "triennial review"; as appropriate, the state must revise its water quality standards to comply with the CWA in that review. See id. at § 1313 (c)(1).

Section 303 of the CWA requires states to establish water quality standards.  See 33 U.S.C. § 1313.  These water quality standards, which amount to a description of the desired conditions of a waterway, consist principally of three components: (i) designated beneficial uses for each water body in the state, such as public water supply, recreation, warm or cold water fish propagation or fishery, wildlife, agriculture, or navigation; (ii) water quality criteria, which define the amounts of pollutants, expressed in either numerical concentration levels or narrative statements or in a narrative form, specifying that the waters can contain an amount of specified pollutants and still, without impairment, protect their designated beneficial uses; and (iii) an anti-degradation provision that contains requirements, which are designed to protect against degradation of waters and ensure that the quality of the water exceeds that necessary to support designated beneficial uses and does not deteriorate below existing levels.  See American Wildlands v. Browner, 260 F.3d 1192, 1194 (10th Cir. 2001); City of Albuquerque v. Browner, 97 F.3d 415, 419 (10th Cir. 1996); 33 U.S.C. §

1313(c)(2)(A); 40 C.F.R. §§ 131.6, 131.10-13.  Courts have held that water quality standards must be both scientifically defensible and protective of designated uses, and must ensure compliance with downstream states' water quality standards.  See NRDC v. EPA, 16 F.3d 1395, 1402 (4th Cir. 1993).  The CWA does not require that states make their water quality standards directly enforceable against dischargers causing or contributing to their exceedance.  New Mexico law does not allow for such direct enforcement.  See N.M. Stat. Ann. § 74-6-10(A)(Michie 1999).

Rather than requiring the states to make their water quality standards directly enforceable against dischargers, the CWA relies primarily on permits issued for point source discharges of pollutants under the National Pollutant Discharge Elimination System ("NPDES") program.  The CWA defines a "point source" as "any discernable, confined and discrete conveyance . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  The statute does not define "nonpoint source."  The courts have, however, generally defined "nonpoint source" by exclusion and includes any pollutant source other than a point source, including, for example, runoff from agricultural fields.  See National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 165-66, 176 (D.C. Cir. 1982).  The CWA does not regulate nonpoint sources.  See American Wildlands v. Browner, 260 F.3d 1192, 1197 (10th Cir. 2001)("In the Act, Congress has chosen not to give the EPA the authority to regulate nonpoint source pollution.").

Permits for point source discharges must include technology-based effluent limitations and, when necessary to achieve the applicable water quality standard for the receiving waterbody, water quality-based effluent limitations.  See EPA v. California ex rel. State Water Res. Control Bd., 426 U.S. 200, 204-205 (1976); 22 U.S.C. § 1311(b)(1)(C); id. at § 1342(a)(1).

Water quality standards are also used as the basis for state actions under CWA § 303(d).  See

-3-

33 U.S.C. § 1313(d).  Under § 303(d), states must identify on a "303(d) list" those waterbodies that cannot achieve the applicable water quality standards through technology-based and other required controls.  See 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.7(b)(1).  For those water bodies, states must establish the maximum pollutant load those waterbodies can receive while still meeting the standard (known as a "total maximum daily load" or "TMDL").  See U.S.C. § 1313(d)(1)(C).  The states must also allocate that load among the various sources of pollutants in the waterbody.  See 40 C.F.R. § 130.2(i).

III.   **THE EPA'S ROLE IN THE WATER QUALITY STANDARDS PROCESS**

    Consistent with the "vigorous federalism underlying the Clean Water Act," United States v. Homestake Mining Co., 595 F.2d 421, 429 (8th Cir. 1979), the CWA limits the EPA's role in the setting water quality standards: "'[S]tates have the primary role, under § 303 of the CWA (33 U.S.C. § 1313), in establishing water quality standards.  EPA's sole function, in this respect, is to review those standards for approval.' . . . Therefore, the EPA has a limited role in reviewing water quality standards."  American Wildlands v. Browner, 260 F.3d 1192, 1194 (10th Cir. 2001)(citing City of Albuquerque v. Browner, 97 F.3d 415, 425 (10th Cir. 1996), and quoting National Res. Def. Council, Inc. v. EPA, 16 F.3d 1395, 1401 (4th Cir. 1993)(emphasis in NRDC v. EPA)).  See City of Albuquerque v. Browner, 97 F.3d at 425 ("Congress clearly intended the EPA to have a limited, non-rulemaking role in the establishment of water quality standards[.]").  In general, the states promulgate water quality standards in accordance with regulations that the EPA promulgates.  See 33 U.S.C. § 1313(c); 40 C.F.R. Part 131.

    The state must submit new or revised water quality standards that it adopts to the EPA for review and approval.  See id. § 1313(c)(2)(A).  The EPA must review the states' new or revised

standards, and approve or disapprove them.  If the EPA determines that revisions to state water quality standards meet CWA's requirements,  the EPA must approve those revisions within 60 days after submission by the state.  See 33 U.S.C. § 1313(c)(3).

If the revised standards are not consistent with the CWA's requirements, the EPA must notify the state within 90 days and specify the changes needed to meet the CWA's requirements.  See id. If the state does not adopt adequate revisions within 90 days of notification by the EPA, the EPA must "promptly prepare and publish proposed [water quality standard] regulations" for the state.  Id. at § 1313(c)(4).  The EPA must then issue final standards within 90 days of publishing the proposed standards unless, "prior to such promulgation, [the] State has adopted a revised or new water quality standard which the Administrator determines to be in accordance with this chapter."  Id.  As this statutory scheme illustrates, "Congress desired that 'the Administrator work closely with the states to obtain approved standards before [s]he promulgates standards for any waters.'"  Environmental Defense Fund v. Costle, 657 F.2d 275, 294 n.56 (D.C. Cir. 1981)(quoting Senate Committee on Public Works, 93rd Cong., 1st Sess., "A Legislative History of the Water Pollution Control Act Amendments of 1972" at 246 (1973)).

The CWA gives the EPA Administrator the authority to review revised or new state water quality standards, approve or disapprove those standards, and issue new standards where necessary. See 33 U.S.C. § § 131(c)(3),(4).  The Administrator has delegated her authority in this regard to the EPA's ten Regional Administrators.  See 40 C.F.R. § § 131.21(a),(b).  The Administrator, however, has retained exclusive authority to propose and promulgate a federal water quality standard if a state does not make the changes specified in a Regional Administrator's disapproval notification.  See 40 C.F.R. § 131.22(a).

## FACTUAL AND PROCEDURAL BACKGROUND

As part of its 1999 triennial review process, New Mexico adopted new and revised standards, including a revised enforcement exemption from certain water quality standards for conditions resulting from "reasonable operation of irrigation and flood control facilities."  This change was made to conform the water quality standards with New Mexico law.  The revised standard provides:

> When changes in dissolved oxygen, temperature, dissolved solids, sediment or turbidity in a water of the state is attributable to natural causes or to the reasonable operation of irrigation and flood control facilities that are not subject to federal or state water pollution control permitting, numerical standards for temperature, dissolved solids content, dissolved oxygen, sediment or turbidity adopted under the Water Quality Act does not apply.

20 N.M. Admin. Code 6.1 § 1105, Administrative Record ("AR") A-1 at 14 ("the exemption").  The New Mexico Water Quality Control Commission ("WQCC") adopted this language from N.M. Stat. Ann. 1978 § 74-6-12(H)(1999), which the New Mexico Legislature passed in 1999.  Previously, a similar exemption had existed, but it had included only dissolved oxygen, sediment, or turbidity; the revised exemption adds temperature and dissolved solids.  See Supplemental Administrative Record 8-S at 6.

New Mexico submitted its revised standards to the EPA on January 25, 2000.  See AR A-1. On January 23, 2001, the EPA approved some of New Mexico's revised standards and disapproved others.  See AR A-3.  Among those disapproved was the irrigation and flood control exemption.

In reviewing the provision at issue, the EPA initially found the flood control and irrigation exemption to be ambiguous, capable of two interpretations.  See AR A-3 at 7.  The EPA expressed concerns that the exemption might violate the CWA.  The EPA explained that it was disapproving the provision because "it could be interpreted as either consistent or inconsistent with the

requirements of the CWA." Id. at 7.  The EPA concluded that one of those interpretations, that the State would exempt certain water bodies from water quality standards if specified sources caused pollution, would be inconsistent with the CWA; and the other, that although the New Mexico Environmental Department ("NMED") required all water bodies to meet water quality standards, certain sources would be exempt from enforcement action, would be consistent with the CWA.  See id.  The EPA stated that, if the provision was merely a limitation on enforcement against certain activities (that is, against nonpoint sources associated with "reasonable operation and maintenance of irrigation and flood control [activities]"), it would be consistent with the CWA.  If, however, New Mexico intended the provision to limit the applicability of numeric standards, so that exceedances of water quality criteria caused by those activities would simply be ignored, the provision would be unacceptable.  Id.

The EPA suggested that it would approve the provision if the state "could provide an interpretation of the underlying statutory provision as precluding enforcement against listed activities . . . and provide EPA assurance that the numeric criteria in question will be considered in assessing water quality in surface waters of the state affected by such activities."  Id.  The EPA conveyed its concerns to WQCC.  See id.  In response, the WQCC wrote to the EPA to eliminate the ambiguity and to explain the provision.  See AR B-4 at 3.  On April 19, 2001, New Mexico provided the assurance that the EPA had requested, stating:

> The Commission interprets this provision to preclude enforcement of the specified numerical standards against listed activities . . . .  However, New Mexico measures, and will continue to measure, these numeric criteria for the purpose of assessing water quality in surface waters of the State affected by such activities.  Any exceedances of these numeric criteria will be fully considered in assessing and reporting water quality. New Mexico will continue to assess the water quality of the surface waters of the State and will list all impaired waters, no matter what the cause, on the State's CWA

§ 303(d) list.

AR B-4 at 3.  Thus assured, the EPA approved the provision on November 6, 2001.  See AR B-5 at 2.  The EPA reasoned that the exemption was not in conflict with the CWA's requirements because: (i) the CWA does not require that water quality standards be directly enforceable against dischargers; (ii) New Mexico law exceeds CWA requirements in that it provides State agencies with authority to take direct enforcement action; and (iii) the provision was merely an exemption from that enforcement authority under state law.  See id.

This lawsuit concerns the EPA's approval of the revised water quality standards that New Mexico submitted to the EPA pursuant to the CWA's requirements, 33 U.S.C. §§ 1251-1387. Plaintiff Defenders of Wildlife alleges that it is a "non-profit District of Columbia corporation . . . comprised of 470,000 members and supporters, including 2,000 members and supporters in New Mexico."  First Amended Complaint ¶ 12, at 3, filed August 7, 2002 (Doc. 13).  It further alleges that "Defenders members frequently visit New Mexico rivers and streams, enjoy the experience of being on or near these rivers and streams, and have specific plans to return to New Mexico rivers and streams."  Id. ¶ 12, at 4.  Its claim of injury is an assertion that "its members have a substantial interest in this matter and are adversely affected and aggrieved[.]"  Id.

Similarly, Forest Guardians is also a non-profit organization.  See id. ¶ 13, at 4.  It alleges that its members "use and enjoy New Mexico's surface waters for recreational, aesthetic, and scientific activities [and] . . . regularly observe and enjoy wildlife, including wildlife which is dependent on New Mexico's limited aquatic system."  Id.  As to injury, like Defenders of Wildlife, Forest Guardians alleges that the organization, its staff, and its members "have a substantial interest in this matter and are adversely affected and aggrieved by the Defendant's failure to comply with the CWA, the

[Endangered Species Act ("ESA")], and the [Administrative Procedure Act ("APA")]." Id. ¶ 13, at 4-5.

In this lawsuit, the Plaintiffs challenge certain aspects of the EPA's approval of New Mexico's revisions to its water quality standards. Specifically, the Plaintiffs challenge the EPA's approval of a provision in the New Mexico standards that exempts from enforcement exceedances of certain numerical criteria in standards attributable to "reasonable operations of irrigation and flood control facilities." In addition, the Plaintiffs contend that the EPA has not properly consulted with the Fish and Wildlife Service in conjunction with its action on New Mexico's standards.

The parties settled the second claim. See Plaintiff's Reply Case Brief, filed June 23, 2003 (Doc. 36) at 1 n.1. This memorandum opinion and order will therefore address only the Plaintiffs' First Claim for Relief and issues in connection with the irrigation and flood control exemption. The Initial Pre-Trial Report which the parties filed and the Court signed specifies that judicial review in this case will take place pursuant to the APA and Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir. 1994), and is based on an administrative record that the EPA prepared.

The Plaintiffs filed their opening brief pursuant to that Initial Pre-Report and pursuant to subsequent orders amending the agreed-upon briefing schedule. The Court extended the original briefing schedule to allow settlement negotiations to proceed. On February 28, 2003, the parties submitted a Joint Motion to Extend the briefing schedule (Doc. No. 25) to allow the Plaintiffs to file their opening brief on April 14, 2003. The Court granted that motion. See Order Granting Parties' Joint Motion to Extend Briefing Schedule, filed April 14, 2004 (Doc. 27).

## STANDARD OF REVIEW

The parties dispute the standard of review. In Chevron, U.S.A., Inc. v. Natural Resources

Defense Council, Inc., 467 U.S. 837 (1984), the Supreme Court held:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.  We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.

467 U.S. at 843-44 (footnotes omitted).  It is the law in the Tenth Circuit that courts are to "accord Chevron deference to the EPA's interpretation of [the CWA] when it makes decisions to approve water quality standards."  American Wildlands v. Browner, 260 F.3d 1192, 1197 (10th Cir. 2001)(discussing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)).  Applying the test that the Supreme Court of the United States developed in United States v. Mead Corp., 533 U.S. 218 (2001), to a review of the EPA's approval of Montana water quality standards under the CWA, the Honorable Deanell R. Tacha, Chief Judge, stated, and the Tenth Circuit held: "It is clear that Congress delegated authority to the EPA to make determinations as to when water quality standards are consistent with the Act. 33 U.S.C. § 1313. . . .  Further, it is clear that EPA's action in this case was taken in the exercise of that authority. . . .  We therefore conduct a Chevron analysis."  American Wildlands v. Browner, 260 F.3d at 1197.  See United States v. Mead Corp., 533 U.S. at 227; City of Albuquerque v. Browner, 97 F.3d at 422 ("The EPA . . . is entitled to considerable deference in its interpretation of the Clean Water Act because it is charged with administering the Act[.]").

The EPA concludes from these cases that the Court here must apply Chevron deference to

the EPA's determination that water quality standards are consistent with the CWA.  The Plaintiffs contend that there are multiple reasons why the Court should not accord the deference to the EPA's position described in <u>Chevron</u>.  The Plaintiffs urge the Court to adopt the arbitrary and capricious standard.

The Plaintiffs cite five cases, but they are not contrary to the standards set forth above.[1]  Four do not address review of the EPA approval of state water quality standards; instead, they deal with alleged mandatory duties that the EPA had not performed under the CWA and applied the arbitrary and capricious standard.  See <u>Miccosukee Tribe of Indians of Florida v. U.S.E.P.A.</u>, 105 F.3d 599, 602 (11th Cir. 1997)(addressing the plaintiff's claim of failure of the EPA Administrator to review new water quality standards); <u>Idaho Conservation League v. Browner</u>, 968 F. Supp. 546, 548 (W.D. Wash. 1997)(addressing the plaintiff's claim of failure to impose federal water quality standards after disapproving state standards); <u>Raymond Proffitt Foundation v. E.P.A.</u>, 930 F. Supp. 1088, 1096 (E.D. Penn. 1996)(same); <u>Sierra Club v. Hankinson</u>, 939 F. Supp. 865, 871 (N.D. Ga. 1996)(addressing the plaintiff's claim of failure to take action on state TMDLs and impose federal TMDLs).  One case, from the District of Oregon, addresses the EPA approval of state water quality standards, but applied an arbitrary and capricious standard without discussing <u>Chevron</u> deference.  See <u>Northwest Environmental Advocates v. E.P.A</u>., 268 F. Supp. 2d 1255, 1259 (D. Or. 2003).

In this circuit, however, <u>American Wildlands v. Browner</u> and <u>City of Albuquerque v. Browner</u> are controlling.  The Plaintiffs' argument is that the Tenth Circuit's standard is incorrect, not that

---

[1] In fact, at the hearing on this matter, the Court offered the Plaintiffs an opportunity to explain the difference between the <u>Chevron</u> deference standard and the arbitrary and capricious standard.  The Plaintiffs were unable to do so.  It appears to the Court that the <u>Chevron</u> standard includes consideration of whether an agency's actions were arbitrary and capricious, so the two appear to be intertwined.

American Wildlands v. Browner is distinguishable.  Given that the Tenth Circuit expressly stated that the Chevron analysis applied in a case reviewing the EPA's approval of a state's water quality standards, this Court does not believe that it has any discretion to re-examine the appropriate standard.

An agency's interpretation of its own regulations is entitled to even greater deference.  Courts must give "controlling weight" to an agency's interpretation of its own regulations, "unless it is plainly erroneous or inconsistent with the regulation."  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)(internal quotations and citations omitted); Auer v. Robbins, 519 U.S. 452, 461 (1997).

As the Tenth Circuit has explained, therefore, in reviewing approval of New Mexico's water quality standards, the Court is to "review the agency action at issue here under the arbitrary and capricious standard and, in conjunction, . . . ask only whether the EPA's interpretation of the Act implicit in its action is a permissible construction of the statute.  'This standard of review is a narrow one, and [the Court] is not empowered to substitute [its] judgment for that of the EPA.'"  American Wildlands v. Browner, 260 F.3d at 1197 (quoting City of Albuquerque v. Browner, 97 F.3d at 424).  If a statute is susceptible to more than one interpretation, a court must accept the interpretation that the agency has chosen if it is reasonable.  See Chevron U.S.A., Inc. v. NRDC, 467 U.S. at 844-45.  Moreover, the question for the Court to address is not whether the Court itself would have reached the conclusion that the agency reached, but rather, whether there is sufficient evidence in the record to support the agency's decision.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).

## LEGAL ANALYSIS

The Plaintiffs contend that it was arbitrary and capricious, and a violation of the CWA, for

the EPA to approve the exemption, because the CWA does not permit elimination of required water quality standards on the basis of the nature of the pollution discharger.  The Plaintiffs argue that this exemption carves a significant hole in New Mexico's water quality standards, contrary to CWA's language and intent.  The Plaintiffs contend that the CWA required the EPA to disapprove this exemption.

## I.     THE PLAINTIFFS HAVE ESTABLISHED THEIR STANDING TO BRING THIS ACTION.

The EPA argues that the Plaintiffs lack standing to challenge the EPA's approval of New Mexico's flood and control irrigation exemption.

### A.     THE PLAINTIFFS HAVE THE BURDEN OF ESTABLISHING STANDING.

The burden of establishing standing rests on the Plaintiffs.  See, e.g., Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103-104 (1998); FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501 U.S. 312, 316 (1991).

The Supreme Court has established that, at the summary judgment stage, a plaintiff cannot rest on mere allegations of injury, but rather must provide affidavits or other evidence showing, through specific facts, that he himself is among the injured, as opposed to simply possessing an interest in the subject matter at issue.  See Lujan v. Defenders of Wildlife, 504 U.S. at 560-62 (holding that standing is a threshold jurisdictional requirement which must be affirmatively demonstrated "in the same way as any other matter on which the Plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of this litigation."); Z.J.

Gifts D-4, L.L.C. v. City of Littleton, 311 F.3d at 1226 (holding that, at the summary judgment stage, "mere allegations of injury, causation, and redressability are insufficient.")(internal quotations and citations omitted); Utah v. Babbitt, 137 F.3d 1193, 1204 (10th Cir. 1998)(holding that elements of standing "must be supported in the same way as any other matter on which plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at successive states of litigation")(quoting Lujan v. Defenders of Wildlife, 504 U.S. at 561). In Sierra Club v. EPA, 292 F.3d 895 (D.C. Cir. 2002), the United States Court of Appeals for the District of Columbia considered the standard to be applied to standing in proceedings on review of an administrative action. The D.C. Circuit held that the same standard set forth by the Supreme Court in Lujan v. Defenders of Wildlife for review at the summary judgment stage should apply. See 292 F.3d at 899. The Court of Appeals went on to hold that a party challenging administrative action

> should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding. In some cases that will be in response to a motion to dismiss for want of standing; in cases in which no such motion has been made, it will be with the petitioner's opening brief – and not, as in this case, in reply to the brief of the respondent agency.

Id. at 900.

"It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record." Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(internal citations and quotations omitted). The Plaintiffs must "allege . . . facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing." FW/PBS v. City of Dallas, 493 U.S. at 231 (internal citations and quotations omitted). In United States v. AVX Corp., 962 F.2d 108 (1st

Cir. 1992), the United States Court of Appeals for the First Circuit held that "barebones allegation[s], bereft of any vestige of a factual fleshing-out" cannot support a finding of injury in fact. Id. at 117. In that case, an environmental organization sought to intervene to object to entry of a consent decree to remediate contamination in Massachusetts. Although the intervenor had alleged it had members in Massachusetts, the First Circuit found that "[t]he averment has no substance: the members are unidentified; their places of abode are not stated; the extent and frequency of any individual use of the affected resources is left open to surmise. In short, the asserted injury is not anchored in any relevant particular." Id. The First Circuit concluded that such allegations constituted "precisely the sort of speculative argumentation that cannot pass muster where standing is contested." Id. (citing FW/PBS v. City of Dallas, 493 U.S. at 231).

Nor does the analysis change where the plaintiffs allege far-reaching environmental harms. In Florida Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996), the D.C. Circuit, en banc, examined standing where the plaintiff alleges environmental harm. The D.C. Circuit explained:

> The presence of a particularized risk of injury to the Plaintiff's interests requires even more exacting scrutiny when the challenged government action is not one located at a particular "site," . . . but instead involves a broad rulemaking . . . . In the case of broad rulemaking, a court may not assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any environmental consequences that the rule itself may cause. Nor is it enough . . . that a plaintiff show that his particularized interest is merely more likely to sustain injury than some other person's interest. . . . Instead, in reviewing an [Environmental Impact Statement] claim, a court must examine whether the demonstrably increased risk of serious environmental harm shown actually threatens the plaintiff's particular interests before that plaintiff may have a particularized injury sufficient for standing.

Id. at 667. Although this case does not involve an Environmental Impact Statement under NEPA, like Florida Audubon, the issues here involve allegations of widespread environmental impact. Moreover, in Florida Audubon, the court's discussion of injury in fact was not specific to the NEPA

setting, but addressed the question "whether appellants have sufficiently demonstrated all of the traditional components of standing." Id. at 665.

The Plaintiffs' First Amended Complaint does not set forth the specific facts necessary for standing. The allegations in their First Amended Complaint fall short of establishing the specific injury that the caselaw requires to support standing. And even if the allegations in the First Amended Complaint were sufficient to withstand a motion to dismiss, without further detail and evidentiary support, they would not be sufficient to establish standing at this point in the proceedings.

The Plaintiffs have not provided in their Opening Case Brief any evidence to support their standing. They provided with their Opening Case Brief no affidavits or other evidence to address these shortcomings. Thus, in their pleadings or opening brief, the Plaintiffs do not establish "specific, concrete facts demonstrating that the challenged practices harm" them as the Supreme Court required for an injury in Warth v. Seldin, 422 U.S. 490, 511 (1975). See Lujan v. Defenders of Wildlife, 504 U.S. at 561; Z.J. Gifts D-4, L.L.C. v. City of Littleton, 311 F.3d at 1226. As in FW/PBS v. City of Dallas, the Plaintiffs here have not provided in their pleadings or in their opening brief substance to their standing allegations.

The Plaintiffs' failure to identify in their Amended Complaint and in their opening brief the region and members impacted in those regions underscores this problem. As in Florida Audubon v. Bentsen, this "court may not assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any environmental consequences that the rule itself may cause." Id. at 667. See also Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., 528 U.S. 167, 181 ("The relevant showing for purposes of Article III standing, however, is not injury to the environment, but injury to the Plaintiff."); American Forest & Paper Ass'n, 154 F.3d at 1159 (holding that association had no

standing to challenge the EPA's approval of Oklahoma's NPDES permits because there was no evidence in the record to support a finding that any member would be affected by the new procedures); City of Waukesha v. EPA, 320 F.3d 228, 236-37 (D.C. Cir. 2003)(finding that "conclusory statement[s] in the administrative record" that the plaintiffs "may be harmed" were insufficient to support standing where the plaintiff organizations had not identified any particular members who would be affected by new drinking water regulations).

The Court's inquiry, however, cannot stop here. Because the EPA has now challenged the Plaintiffs' standing, the Plaintiffs submit the Declarations of Jess Alford, John Horning, and Kara Gillon. The EPA asks the Court to disregard these affidavits and review only the allegations in the complaint. The EPA argues that, as the D.C. Circuit stated in Sierra Club v. EPA, the Plaintiffs should have submitted any factual allegations together with their evidence in support of their standing no later than their opening brief. They did not do so. Because the Plaintiffs did not meet their initial burden to establish any particularized injury in fact, the EPA urges the Court to dismiss their claims.

The Plaintiffs argue that the EPA's Response is the first time in this litigation that the EPA has alleged that the Plaintiffs lack standing to bring their CWA challenge to the flood control and irrigation exemption. The Plaintiffs contend that the EPA did not at any point during these lengthy proceedings or during negotiations advise them that it intended to raise a standing objection. In the Initial Pretrial Report filed on October 7, 2002, (Doc. 16), the parties stipulated that the Court had jurisdiction over the parties and subject matter of this case. See Initial Pre-Trial Report at 3.

In setting forth the EPA's contentions in the Initial Pretrial Report, the EPA stated only its allegations that its approval of New Mexico's irrigation and flood control exemption was consistent with the CWA and that its actions also complied with consultation requirements of the Endangered

-17-

Species Act.  See id. at 3.  The Report did not notify the Plaintiffs or the Court that the EPA intended

to argue that the Plaintiffs lacked standing.  The Plaintiffs represent that, because the EPA had not

filed such objection before their Response, the Plaintiffs did not submit declarations from their

organizations and from their members addressing the particulars of the factual basis for their standing

at the time that they filed their Opening Case Brief.

The Tenth Circuit has not cited or discussed the pleading/evidentiary rules that the D.C.

Circuit set forth in Sierra Club v. EPA.  There is no indication that the Tenth Circuit would adopt

such rules if it considered the matter.  Moreover, the D.C. Circuit in Sierra Club v. EPA was

announcing the rules prospectively; in that case, the court did consider the material in the reply.  The

D.C. Circuit gave the lawyers in its circuit some warning of the new rule.  Neither the Tenth Circuit

nor any judge in this District has given litigants any prospective warning.   To apply the Sierra Club

v. EPA rule's in this case would be the first application anywhere in the Tenth Circuit and in a district

without any warning that was going to be the rule.  This Court will not apply the Sierra Club v. EPA

rule in this case.

There are two other reasons that the Court should not apply the Sierra Club v. EPA rule in

this case, even if that rule otherwise becomes the rule in this Circuit.  First, the EPA had not raised

questions about the Plaintiffs' standing before its Response.  Second, the EPA had stipulated, in the

Initial Pretrial Report, that the Court had jurisdiction over the parties and the subject matter of this

case.  Given these distinctions, it would be inequitable to the Plaintiffs for the Court to apply the

Sierra Club v. EPA rule in this case and to not consider their evidence of standing.

**B.    THE PLAINTIFFS NEED ONLY ESTABLISH ONE ASSOCIATION HAS STANDING.**

Courts have held that, if any single plaintiff has standing, the court has jurisdiction over the case and need not consider whether any other plaintiff has standing as well.  See Board of Natural Resources of the State of Washington v. Brown, 992 F.2d 937, 942 (9th Cir. 1993); Mountain States Legal Foundation v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally  protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, Second, there must be a causal connection between the injury and the conduct complained of-- the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 - 61 (1992)(internal quotation marks, citations and footnotes omitted).  See  Committee To Save the Rio Hondo v. Lucero, 102 F.3d 445, 447 (10th Cir. 1996); Z.J. Gifts D-4, L.L.C. v. City of Littleton, 311 F.3d 1220, 1226 (10th Cir. 2002).

Where, as here, an organization seeks to represent its members' interests, that organization must establish that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977); American Forest & Paper Ass'n v. EPA, 154 F.3d 1155, 1158-59 (10th Cir. 1998).  See Committee To Save the Rio Hondo v. Lucero, 102 F.3d at 447; American Wildlands v. Browner, 94 F. Supp. 2d at 1155.  "The Supreme Court has recently recognized that the first requirement of associational standing embodies

-19-

the Article III requirements of injury in fact, causal connection to the defendant's conduct, and redressability." American Forest & Paper Ass'n v. EPA, 154 F.3d at 1159 (citing United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 555 (1996)). Plaintiffs suing under the APA, as in this case, must also establish that they are "adversely affected or aggrieved . . . within the meaning of a relevant statute" by some final agency action. 5 U.S.C. § 702. See Lujan v. National Wildlife Federation, 497 U.S. 871, 882 (1990); Committee to Save the Rio Hondo v. Lucero, 102 F.3d at 448.

The EPA agrees that the Plaintiffs meet two of the three requirements regarding standing, that the interests they seek to protect are germane to their organizational purposes and neither the claim nor the relief requested requires the participation of individual members. Thus, the only disputed issue is whether the Plaintiffs' members would otherwise have standing to sue in their own right.

### C.    THE PLAINTIFFS' MEMBERS WOULD OTHERWISE HAVE STANDING.

#### 1.    Injury in Fact

To meet the test's first prong, "the association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." Warth v. Seldin, 422 U.S. at 511. Further, the Supreme Court requires allegations of "specific, concrete facts demonstrating that the challenged practices harm [Plaintiffs] and that [Plaintiffs] personally would benefit in a tangible way from the court's intervention." Id. at 508 (emphasis added). On the other hand, the plaintiff satisfies the "injury in fact" requirement in environmental cases if an individual adequately shows that he or she has an aesthetic or recreational interest in a particular place, animal, or plant species and that the defendant's conduct impairs that interest. See, e.g., Friends of the Earth,

Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 183 (2000); Lujan v. Defenders of Wildlife, 504 U.S. at 562-63.  In addition, in environmental cases, harm to the environment need not be proved; procedural violations not causing environmental harm also give rise to legal actions. See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. at 181-82; Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 163-64 (4th Cir. 2000)(en banc).

Turning to the Plaintiffs' affidavits, the declarations show both personal and professional ties to the alleged injury.  Jess Alford is a professional photographer and has recreational and aesthetic interests concerning New Mexico rivers, and is also a Board member of the Forest Guardians.  Alford has both professionally and personally led hikes and canoe trips on New Mexico rivers and claims to have noticed

> large amounts of floodwater or storm water being discharged into the Rio Grande at various locations along the river.  It is my understanding that there are water quality exemptions for water coming from irrigation and flood control operations.  Since floodwaters, storm waters, and agricultural return flows are a very large proportion of the water discharge that goes into our rivers, I believe that [the] exemption results in serious harm to our rivers. . . .

Declaration of Jess Alford ¶ 10, at 4 (executed June 23, 2003).

Similarly, John Horning and Kara Gillon have both professional and personal interests concerning the rivers of New Mexico.  John Horning is the Executive Director for the Forest Guardians and Kara Gillon is the Water Counsel for Defenders of Wildlife.  See Declaration of John C. Horning ¶ 1, at 1, (executed June 23, 2003); Declaration of Kara Gillon ¶ 1, at 1 (executed June 23, 2003).  They are outdoor enthusiasts and are also worried about the safety of drinking water and effects that the releases from the flood control and irrigation exemption will have upon New Mexico rivers.  See Horning Decl. ¶¶ 8-12, at 4-5; Gillon Decl. ¶¶ 7-10, at 3-4..

-21-

The Plaintiffs have shown, through affidavits and concrete evidence, that they may have suffered an "injury in fact" for purposes of standing, because of direct interests they have in keeping New Mexico's waters "free from excessive amounts of the five pollutants of the challenged exemption." Plaintiff's Reply Memorandum Re: Standing, filed April 9, 2004 at 3 (Doc. 62).   The Plaintiffs have also shown that New Mexico's list of impaired streams may contain many stream segments which violate the numeric standards for the five exempted pollutants and where causes of the violations include flood and irrigation control facilities.   Additionally, the EPA stipulated at the hearing on this matter held January 15, 2004 that the declarations submitted by Plaintiffs "are sufficient to assert 'injury-in-fact'." Defendant United States Environmental Protection Agency's Response Memorandum Re Standing at 2, filed March 29, 2004 (Doc.61).   The Plaintiffs have, therefore, satisfied this prong of the standing requirement.

2.   **Causation**

"The issue in the causation inquiry is whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." Ecology Rights Foundation v. Pacific Lumber, 230 F.3d 1141, 1151 (9th Cir. 2000)(citing Lujan v. Defenders of Wildlife, 504 U.S. at 560)).   The Tenth Circuit has distinguished between the injury-in-fact requirement and the causation requirement:

> Whether an increased risk will or will not occur due to the agency action determines whether a plaintiff has suffered injury in fact, not causation.   Certainly, under the injury in fact prong [of standing analysis], a plaintiff cannot merely allege that some highly attenuated, fanciful environmental risk will result from the agency decision; the risk must be actual, threatened or imminent.   However, once the plaintiff has established the likelihood of the increased risk for purposes of injury in fact, to establish causation . . .  the plaintiff need only trace the risk of harm to the agency's alleged failure to follow the [law].

Committee To Save the Rio Hondo v. Lucero, 102 F.3d at 451-52.

Where a plaintiff has sued a defendant under the CWA, alleging unlawful discharges of pollutants, the standard is whether the pollutant causes or contributes to the kinds of injuries that the plaintiff alleges.  See Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn, 913 F.2d 71, 72 (3d Cir. 1990).  In such cases, "the threshold requirement of 'traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs' in order to establish standing."  NRDC v. Southwest Marine, Inc., 236 F.3d 985, 995 (9th Cir. 2000)(quoting Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 161 (4th Cir. 2000)(en banc)).  Rather, "a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."  Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d at 161.  See also Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 558 (5th Cir. 1996).

The EPA argues that the Plaintiffs have not established the necessary causation because they have not shown conclusively that the challenged water quality standards exemption necessarily results in exceedence of the five exempted numeric pollutant standards.  However, the Supreme Court held in Friends of the Earth, Inc. v. Laidlaw Env. Services (TOC), Inc., 528 U.S. at 181, that a plaintiff bringing suit under the CWA and other environmental statutes need not show that injury to the environment has resulted from the defendant's challenged actions.  While there was "no demonstrated proof of harm to the environment," the Supreme Court found that the plaintiffs met all the requirements for standing.  Id.  The Supreme Court explained the error in the defendant's argument that the plaintiffs must demonstrate that the challenged conduct results in harm to the environment:

> The relevant showing for purposes of Article III standing, however, is not injury to the environment, but injury to the plaintiff.  To insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with

an NPDES permit.

Id. 528 U.S. at 181.

In this case, the Plaintiffs have shown that they have suffered an "injury in fact" for purposes of standing, as the Court explained above.  The Court believes that the Plaintiffs here have shown that elimination of the exemption will enable actions to be taken under various CWA provisions to mitigate and eliminate the violations caused by reasonable operation of flood control and irrigation facilities.  Thus, the challenged water quality standards exemption creates at least an "increased risk" of violations of the applicable water quality standards.

The Plaintiffs must only show an alleged traceability from the risk of harm to them to the EPA's actions in approving the exemption.  The Plaintiffs have done so.  The Plaintiffs have thus met the causation element of standing.

### 3.    **Redressability**

To establish redressability, "a plaintiff must . . . establish it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Committee To Save the Rio Hondo v. Lucero, 102 F.3d at 452.  A plaintiff seeking injunctive relief satisfies this requirement "by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard."  NRDC v. Southwest Marine, 236 F.3d at 995.  As the Supreme Court noted in finding that an environmental organization had standing to bring a CWA claim for civil penalties:

> It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description.  To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.

-24-

Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. at 185-86.

The EPA argues that the challenged exemption applies only to nonpoint source pollution and because that nonpoint source pollution is beyond the CWA's scope, the Plaintiffs cannot obtain relief. For purposes of a standing analysis, however, the Court assumes that the alleged legal violations have occurred and asks whether a favorable decision in the case will redress the injury that the plaintiffs have alleged.  See Committee To Save the Rio Hondo v. Lucero, 102 F.3d at 452.  To satisfy redressability, the plaintiff need show only "the likelihood (as opposed to speculation) that the injury will be redressed by a favorable decision."  Southwest Center for Biological Diversity v. Clark, 90 F. Supp. 2d 1300, 1310 (D.N.M. 1999)(Mecham, Senior Judge).  Where the plaintiff has established that the challenged action causes him or her an ongoing injury in fact, then an order invalidating and enjoining further application of the challenged action will redress the injury.  See Friends of the Earth, Inc. v. Laidlaw Env. Services (TOC), Inc., 528 U.S. at 185-186.

The Plaintiffs seek declaratory and injunctive relief that would set aside the EPA's approval of the irrigation and flood control exemption and thus invalidate the exemption.  The end result -- the invalidation of the exemption -- would redress the injury that the plaintiffs have alleged.  Therefore, for the purposes of standing, the Plaintiff's have met the redressability requirement.

### D.   THE INTERESTS THAT THE PLAINTIFFS SEEK TO PROTECT ARE GERMANE TO THEIR PURPOSE.

The Defenders of Wildlife's organizational purposes include "protecting native wild animals and plants in their natural communities" and addressing "water quality issues as they impact wildlife and wildlife habitat, both in New Mexico and around the country."   Gillon Decl. ¶¶ 3, 5, 6, at 2-3. Forest Guardians' organizational purposes  include "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" Horning Decl. ¶¶ 3, 4, at 1-2.  The Plaintiffs' stated

interests to protect water quality in this case are germane to the Defenders of Wildlife's and Forest

Guardian's purpose.  See, e.g., Vermont PIRG v. U.S. Fish & Wildlife Service, 247 F. Supp. 2d 495,

506 (D.Vt. 2002) ("[T]he ecosystem injuries and loss of use of the creek for study, recreation, and

observation of wildlife are clearly germane to the purposes of VPIRG and NAS.").

The EPA has agreed that "Plaintiffs in this matter, Defenders of Wildlife and Forest

Guardians, meet two of the three requirements for associational standing, . . . the interests they seek

to protect are germane to their organizational purposes . . . ." Defendant United States Environmental

Protection Agency's Response Memorandum Re Standing at 2.  The Court agrees.

> ### E.    NEITHER THE CLAIM ASSERTED NOR THE RELIEF REQUESTED REQUIRES THE PARTICIPATION OF INDIVIDUALS IN THE LAWSUIT.

The EPA has agreed that "neither the claim nor the relief requested requires the participation

of individual members."  Defendant United States Environmental Protection Agency's Response

Memorandum Re Standing at 2.  The Court agrees.  Accordingly, the Plaintiffs have established

standing in this case.

## II.    THE EPA'S APPROVAL OF NEW MEXICO'S IRRIGATION AND FLOOD CONTROL EXEMPTION WAS NOT ARBITRARY AND CAPRICIOUS.

The dispute on the merits is primarily about how to read the exemption.  If the Plaintiffs'

reading of the provision were correct, the EPA would agree that the exemption would not be

consistent with the CWA.  The exemption, as interpreted by the Chairman of the WQCC, however,

does not violate the CWA.  Because the Plaintiffs misread the exemption, and because the EPA

reasonably concluded that the exemption is consistent with the CWA, the Court will uphold the

EPA's action.

A.     THE EXEMPTION IS CONSISTENT WITH CWA.

If the Plaintiffs have standing, as the Court so finds, they must then establish that the EPA acted arbitrarily and capriciously in approving the New Mexico Water Quality Standards.  The Plaintiffs appear to assume that New Mexico's irrigation and flood control exemption means that waters that do not meet New Mexico's water quality standards will be left unaddressed if flood control or irrigation operations contribute to the water quality impairment.  This assumption, however, does not take into account the record before the Court.

The provision's inherent ambiguity is what prompted the EPA's original objections to the exemption.  See AR A-3 at 7.  As clarified, however, the EPA had no basis to withhold approval of the provision.

New Mexico's WQCC, author and enforcer of the exemption at issue, has stated that the provision does not exempt any waters from measurement for compliance with the water quality standards.  If NMED detects noncompliance, it will place such waters on the 303(d) list and develop TMDLs as needed to achieve compliance, regardless of the source of pollution.  See AR B-4 at 3. The State has said that it will treat all nonconforming waters in the same way for CWA purposes, whether the source of impairment to the water is irrigation and flood control activities or something else.  See id.  The record does not contradict the State's representation or support the Plaintiffs' fears.  Nor do the documents that the Plaintiffs seek to add to the record contradict the State or support the concerns expressed.

The EPA's conclusion regarding the irrigation and flood control exemption, as the WQCC has clarified it, is consistent with the CWA is thus reasonable.  The CWA does not require that water quality standards be directly enforceable against dischargers.  Instead, the CWA relies on permits that

-27-

the state issues to dischargers to achieve water quality standards.

Moreover, New Mexico goes beyond the CWA.  New Mexico law provides: "Whenever . . . a constituent agency determines that a person violated or is violating a . . . water quality standard . . . the constituent agency may" issue a compliance order against the violator or institute a civil action for relief.  NMSA 74-6-10A.  This provision allows the State to take enforcement action against dischargers, even where the State requires no permit.  See AR B-5.

The Commission has explained that the exemption at issue is a limitation on the State's enforcement authority, which CWA does not require.  See AR B-4 at 3.  Because the provision is not an exemption from CWA's requirements, but a limitation on state enforcement authority that goes beyond CWA's requirements, the provision is not inconsistent with the CWA.  Accordingly, the EPA properly approved the exemption.  See 33 U.S.C § 1313(c)(3).

Moreover, the exemption on its face applies to nonpoint sources, that is, conditions "not subject to federal or state water pollution control permitting."  20 N.M. Admin. Code 6.1 § 1105, AR A-1 at 14; N.M. Stat. Ann. § 74-6-12H (1999).  As the Tenth Circuit has recognized, the EPA has no authority to regulate nonpoint sources pursuant to the CWA; accordingly, it is reasonable for the EPA to conclude that a provision exempting nonpoint sources from enforcement is consistent with the CWA.  See American Wildlands v. Browner, 260 F.3d at 1197.  The Tenth Circuit's discussion of the CWA in American Wildlands v. Browner is on point.

In that case, the Tenth Circuit reviewed the EPA's approval of Montana's water quality standards.  Among the issues addressed was the EPA's approval of an exemption from Montana's antidegradation policy that excluded some nonpoint source pollution from antidegradation review. See id. at 1197.  The Tenth Circuit agreed with the EPA that, "[b]ecause the Act nowhere gives the

-28-

EPA the authority to regulate nonpoint source discharges, the EPA's determination – that Montana's water quality standards exempting nonpoint source discharges from antidegradation review are consistent with the Act – is a permissible construction of the Act." Id. at 1198.  Likewise, here, as clarified, WQCC's irrigation and flood control exemption exempts nonpoint source discharges from enforcement under state law.  Because the EPA has no authority under the CWA to regulate nonpoint sources, its interpretation that New Mexico's exemption is consistent with the CWA is permissible.

## B.    THE EPA REASONABLY RELIED ON THE WQCC'S INTERPRETATION OF ITS OWN REGULATION.

The Plaintiffs argue that the EPA's reliance on the Commission's interpretation of its own regulation was unwarranted and complain that the letter is "an unenforceable commitment." Plaintiffs' Brief at 14.  This argument, if adopted, would create a number of problems for the Court and invite it to do a number of things that are inconsistent with established administrative law principles.  First, the argument assumes that the EPA and the Court must disregard the Commission's response to the EPA's concerns regarding this provision.  Second, if the Court were to adopt the Plaintiffs' argument, the EPA and the Court would need to develop their own interpretations of the meaning of the state regulation.  Third, the Plaintiffs urge the Court to adopt an interpretation, or assume that the Commission will apply an interpretation, that will be inconsistent with the CWA. Such an approach to regulatory interpretation is inconsistent with traditional principles of federal/state comity and with established rules regarding deference to agency authority.

Just as federal courts "must give substantial deference to an agency's interpretation of its own regulations," Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994), so the EPA is reasonable in giving deference to a state's agency's interpretation of its own regulations, see, e.g., New Mexico State Bd. of Psychologist Exam'rs v. Land, 62 P.3d 1244, 1247 (N.M. App.

2002)(deferring to New Mexico agencies under New Mexico law: "Ordinarily, the court must defer to an agency's interpretation of its own regulations.")(citing cases).  These cases suggest that, even if the Court is not required to give deference to WQCC's interpretation of its own regulations, there is no sound reason not to do so and there are many good reasons to do so.  See Chevron v. Natural Resources Defense Council, 467 U.S. at 844 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").  The interpretation that the WQCC provided the EPA is consistent with the exemption's language as written and the EPA has no basis to conclude that the WQCC will not interpret the exemption in the way it says it intends.

Moreover, should the WQCC change its interpretation, the EPA may withdraw its approval of the provision or exercise its authority under § 303(c)(4)(B) of the CWA to promulgate a superseding federal standard.  WQCC's stated interpretation of the regulation, therefore, is enforceable against the state agency, providing additional assurance that the WQCC will abide by its stated intentions.

The Plaintiffs rely upon Northwest Environmental Advocates v. U.S.E.P.A., 268 F. Supp. 2d 1255 (D. Or. 2003), but that opinion is not contrary to what the Court is saying here.  In that case, the EPA approved an Oregon water quality standard of 6 miligrams per liter (mg/L) of intergravel dissolved oxygen (IGDO) for certain waters despite that 8 mg/L was preferable for protection of certain species.  See id. at 1268.  The EPA based its approval on an unenforceable and unpromulgated commitment from Oregon to apply a standard of 8 mg/L when determining what waters to include on its 303(d) list of impaired waters.  See id. at 1269.  The district court found the

EPA's approval on that basis to be arbitrary and capricious.  See id.  The court noted, however, that, "[i]f Oregon had specifically promulgated an 8.0 mg/L for threatened species, the situation would be different."  Id. at 1268.

Here, the situation is different.  The EPA rested its approval of New Mexico's standard based on the exemption's language as promulgated.  The WQCC has not promised to apply a different standard in some circumstances; instead, it has clarified what the enforceable, promulgated standard means in all circumstances.  The reasoning of Northwest Environmental Advocates, therefore, does not apply.

Moreover, to the extent that the Plaintiffs are arguing that the WQCC might someday change its interpretation of the exemption and implement it in a manner inconsistent with the CWA, their argument or claim is not ripe: "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  Texas v. United States, 523 U.S. 296, 300-302 (1998)(holding that State request for declaratory judgment regarding application of federal statute not ripe because triggering events too speculative)(quoting Thomas v. Union Carbide Agricul. Prod. Co., 473 U.S. 568, 580-81 (1985)).  Here, the Plaintiffs' argument assumes: (i) that the WQCC will change its interpretation of the exemption; (ii) that the WQCC's new interpretation will be inconsistent with the CWA; and (iii) that the EPA will not take action.  If and when these events occur, the claim may be justiciable.  But that is not the case now.

## C.    THE EPA HAS TAKEN A CONSISTENT POSITION ON THE EXEMPTION.

The Plaintiffs accuse the EPA of a "last minute turn around" in its position on the exemption. Plaintiffs' Brief at 14.  The concerns that the EPA first expressed to the WQCC are, however, consistent with the EPA's comments in its review of the WQCC's final standards submitted to the

EPA for review.  Initially, the EPA indicated that the exemption could be interpreted as inconsistent with the CWA and sought clarification of the exemption's meaning.  See AR A-3 at 7.  Had WQCC not clarified the exemption and explained that it does not affect applicability of the water quality standards to bodies of water, the EPA's concerns as expressed in the documents the Plaintiffs cite would have required the EPA to disapprove the exemption.

It was not the EPA's position on the CWA requirements that changed, but the EPA's understanding of the exemption's meaning.  See, e.g., Plantiff's Exhibit. 3 at 3 ("[I]t is inappropriate to exempt bodies of water from water quality standards[.]"); New Mexico WQS -- 1998 Triennial Revision at 1 ("The State could define 'reasonable operation of irrigation and flood control facilities' as required by the State's WQ Act to assure the EPA that the designated uses will be protected and maintained.").

### D.   THE PLAINTIFFS' PREDICTIONS OF NEGATIVE IMPACT TO NEW MEXICO'S WATERS ARE NOT WELL FOUNDED.

The Plaintiffs have posited a series of ill effects from the EPA's approval of the irrigation and flood control exemption.  These warnings, however, misconstrue both the exemption itself and the CWA as a whole.  For example, the Plaintiffs first charge that the exemption will "make it impossible" to achieve compliance with water quality standards, "or, at minimum, . . . unfairly place the entire burden for attaining compliance on all non-exempted dischargers." Plaintiff's Brief at 12-13.

In support of this charge, the Plaintiffs identify Costilla Creek as a water body that does not currently meet water quality standards.  They provide no evidence, however, to suggest that it is impossible for the creek to come into compliance, or that the exemption at issue has any impact at all on that specific body of water.  The Court will, therefore, not address these contentions.

Even if the Plaintiffs were to show flood control and irrigation waters had an impact on

Costilla Creek, the Plaintiffs' fears would remain speculative. The State has stated that it will develop TMDLs for all 303(d) waters, which would include Costilla Creek, regardless of the source of contaminants. See AR B-4 at 3.

There are at least two remaining means by which the State may assert control over exempted facilities contributing to water quality problems. First, it may enforce one or more of its narrative criteria at 20 N.M.A.C. 6.1, § 1105 against specific facilities because the exemption only applies to "numerical criteria" for certain pollutants. Second, it could promulgate a regulatory definition of "reasonable operation and maintenance" identifying management practices for reducing pollutant loadings from all such facilities. Forest Guardians has argued that the Commission should adopt such a regulatory definition. See AR 3-S at 1010-1024.

Moreover, as discussed above, the Plaintiffs' argument assumes that, but for the exemption, "irrigation and flood control facilities that are not subject to federal or state water pollution control permitting" would be subject to enforcement under the CWA. As noted above, that assumption is incorrect. The exemption addresses nonpoint source discharges, which, as the Tenth Circuit has recognized, are not subject to regulation under the CWA. See American Wildlands v. Browner, 260 F.3d at 1197.

Moreover, even assuming that the Plaintiffs are correct that non-exempt dischargers will bear a larger burden in achieving the standards, that is a decision for the State to make as it develops TMDLs. In view of the "vigorous federalism of the Clean Water Act," the EPA may not tell a state how to achieve its water quality standards, or how to allocate the burden of meeting those standards among its citizens. United States v. Homestake Mining Co., 595 F.2d 421, 429 (8th Cir. 1979). If a state meets the CWA's requirements, the CWA limits the EPA's role to reviewing the standards

themselves to ensure their compliance with the Act.  See American Wildlands v. Browner, 260 F.3d at 1194 ("[T]he EPA has a limited role in reviewing water quality standards.").

Next, the Plaintiffs charge that the exemption ties the hands of the Army Corps of Engineers ("Corps") when the Corps issues CWA § 401 permits for construction or reconstruction of levees because the exemption prevents the State from exercising its CWA § 401(a) certification authority over such actions.  Again, the Plaintiffs misunderstand the scope of New Mexico's exemption and of the CWA.  The exemption only applies to "reasonable operation and maintenance" of flood control facilities, not their construction or reconstruction.

Nor does it necessarily affect the State's 401 certification rights, which are not provided by New Mexico's water quality standard "enforcement" statute, but by the CWA itself.  Moreover, in issuing permits for such construction or deciding to undertake such construction itself, the Corps must apply regulatory guidelines that the EPA promulgates pursuant to § 404(b)(1) of the CWA, 33 U.S.C. § 1244(b)(1).  See, e.g., Save Our Sound Fisheries Association v. Callaway, 387 F. Supp. 292, 304-307 (D. R.I. 1974); 33 C.F.R. § 336.1(a).  Those guidelines require the Corps to consider adverse impacts to water quality.  See 40 C.F.R. § 230.10(c).  Hence, even if New Mexico law prohibits the use of 401(a) certification rights on flood control projects that the Corps permits or undertakes, the Corps would still have to consider adverse water quality effects in issuing a permit pursuant to § 404 of the CWA.

In conclusion, the EPA reasonably approved New Mexico's water quality standards.

**IT IS ORDERED** that the EPA's approval of New Mexico's water quality standards is affirmed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Alletta Belin
Steven Sugarman
Belin & Sugarman
Santa Fe, New Mexico

     *Attorneys for the Plaintiffs*

Thomas L. Sansonetti
  Assistant Attorney General
Mauricia M.M. Baca
  Trial Attorney, Wildlife and Marine Resources Section

Lois Godfrey Wye
  Trial Attorney, Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C.

Jan Elizabeth Mitchell
  Assistant United States Attorney
  District of New Mexico
Albuquerque, New Mexico

     *Attorneys for the Defendant*

Of counsel:
Cathy Winer
Patrick Rankin
United States Environmental Protection Agency

-35-